IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| GAYLE H. GEAR, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:09cv970-MEF |
| | ) | |
| ALABAMA STATE UNIVERSITY, *et al.*, | ) | (WO-Do Not Publish) |
| | ) | |
| DEFENDANTS. | ) | |

## CORRECTED MEMORANDUM OPINION AND ORDER

Gayle H. Gear ("Gear"), an unsuccessful applicant for the position of President of

Alabama State University ("ASU") brings this suit against ASU and its Board of Trustees

pursuant to 42 U.S.C. § 2000e *et seq.* ("Title VII") and 28 U.S.C. § 1983 alleging race and

sex discrimination.  This cause is before the Court on the Defendants' Motion for Summary

Judgment (Doc. # 34).  For the reasons set forth below, the motion is due to be GRANTED

in PART and DENIED in PART.

### JURISDICTION AND VENUE

The Court exercises subject matter jurisdiction over this action pursuant to 28 U.S.C.

§ 1331 (federal question) and 28 U.S.C. § 1343 (civil rights).  The parties do not contest

personal jurisdiction or venue, and the Court finds adequate allegations supporting both.

### STANDARD

Pursuant to Federal Rule of Civil Procedure 56(a), "a party may move for summary

judgment, identifying each claim or defense — or the part of each claim of defense — on

which summary judgment is sought." A court presented with such a motion must grant it "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A genuine dispute as to a material fact can only be found "if the evidence is such that a reasonable jury[1] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). According to the Supreme Court, "a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986) (quotation omitted). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-23.

After the movant satisfies this requirement, the burden shifts to "the adverse party [who] must set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 250 (quotation omitted). "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247-48. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."

---

[1] In this case, which has no jury demand, this standard should be considered to be whether there exists evidence from which a reasonable fact finder could find in favor of the non-moving party.

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).  The Eleventh Circuit Court of Appeals has held that "[a]ll reasonable inferences arising from the undisputed facts should be made in favor of the nonmovant, but an inference based on speculation and conjecture is not reasonable." *Blackston v. Shook & Fletcher Insulation Co.,* 764 F.2d 1480, 1482 (11th Cir. 1985) (citation omitted).

## FACTS AND PROCEDURAL HISTORY

The Court has carefully considered all deposition excerpts and documents submitted in support of and in opposition to the motion.  The submissions of the parties, viewed in the light most favorable to the non-moving party, establish the following facts relevant to the issues raised by Defendants' motion:

ASU is a public institution of higher education currently located in Montgomery, Alabama.  ASU started out as a private institute called the Lincoln Normal School, which had a stated goal of "the Higher Education of the Colored Race."  Today, ASU enrolls more than 4,500 students in its seven major units: University College, the College of Arts and Sciences, the College of Business Administration, the College of Education, the School of Music, the Division of Aerospace Studies, and the School of Graduate Studies and Continuing Education.  ASU is under the management of a Board of Trustees.  The Governor of the State of Alabama, with advice and consent of the state Senate, appoints the members of the Board

of Trustees[2] to twelve-year staggered terms.

In 1978, an employee of ASU named Charles Craig brought a civil rights class action against ASU alleging a pattern and practice of discrimination against Caucasian employees with respect to hiring of administrative, teaching, clerical, and support staff and with respect to promotion and tenure decisions for such staff.  *See Craig v. Ala. State Univ.*, 451 F. Supp. 1207 (M.D. Ala. 1978), *aff'd without opinion,* 614 F.2d 1295 (5th Cir. 1980).  Judge Johnson determined that class certification was indeed appropriate and defined a broad class of past, present, and future Caucasian employees of ASU, past and future Caucasian applicants for positions at ASU, and Caucasian persons who would have applied for employment at ASU. 451 F. Supp. at 1208 n.1.  After a trial on the merits, Judge Johnson found in favor of the plaintiffs and concluded that "in the hiring of its administrative, teaching, and clerical and support staff and the promotion and tenure of its faculty, ASU ha[d], as alleged by plaintiffs, engaged in a pattern and practice of discrimination against whites."  *Id.* at 1208.  Although it is not in the record before the Court, Judge Johnson's finding in this case apparently culminated in entry of an injunction forbidding any further discrimination at ASU in all

---

[2]  The members of the Board of Trustees are: Oscar Crawley, Bobby Junkins, Taylor Hodge, Buford Crutcher, Thomas Figures, Lawrence Lemak, Marvin Wiggins, Herbert Young, and Elton Dean.  Dean serves as the Chair of the Board of Trustees.  When referred to collectively, they will be called "the Board of Trustees."  When referred to individually, they will be called by their surnames.

4

aspects of hiring practices. *See Craig v. Ala. State Univ.*, 804 F.2d 682 (11th Cir. 1986).[3]

Throughout ASU's entire history, the only people who have served as President of ASU have been male. All but the very first of these men, William Burns Patterson, have been African-American. In February of 2008, Joe Lee ("Lee") held the position of President of ASU. At a meeting of the Board of Trustees in February of 2008, Lee announced his

---

[3] In 1983, a Caucasian female named Dorothy Moore ("Moore") approached ASU's President in search of a position at ASU. 804 F.2d at 682. Moore was told nothing was available at that time but that if grant funds could be obtained she could be employed on a temporary basis. *Id.* Later in the year, ASU hired Moore as Assistant Director of University Relations. *Id.* ASU gave Moore two contracts: one from July to September of 1983 and the other from October of 1983 to September of 1984. *Id.* Moore understood that while the President could fill the position on an interim basis the opening would have to be advertised before it could be filled on a permanent basis. *Id.* The Board of Trustees met in August of 1983 and discussed Moore's first contract, but not her second contract. *Id.* After the Board meeting, the President of ASU told Moore that only her first contract would be honored, but that she could apply when the position was advertised. *Id.* at 683-84. ASU advertised the position. *Id.* at 684. Jacqueline Williams ("Williams"), a long time ASU employee, who had been taking study leave to pursue a degree notified ASU that she wished to be considered for re-employment. *Id.* At its September 1983 meeting, which was convened nearly a week before the advertised closing date for the application period for the position of Director of Federal Relations, the Board of Trustees voted to hire Williams as Director of Federal Relations. *Id.* When Moore responded to the advertisement for that position a few days later, she learned that it had been given to Williams. *Id.* Moore filed a Motion for Contempt in the *Craig* case, alleging that her application had been rejected because of her race in violation of the 1978 injunction prohibiting discriminatory employment practices at ASU. *Id.* at 682. At the district court level, Moore was initially unsuccessful, but the Eleventh Circuit reversed the district court's finding in favor of ASU and remanded the case for a determination of proper relief. *Id.* at 691.

intention to retire[4] in May of 2008.

In March of 2008, ASU formed a Search Committee to conduct a search for the position of President of ASU.  Dean and other members of the Board of Trustees determined the identity of those individuals selected to serve on the Search Committee. Dean appointed Wiggins, a member of the Board of Trustees, to serve as Chairman of the Search Committee. Dr. John Knight ("Knight"), although not a member of the Board of Trustees, also served as a member of the Search Committee.

The Board of Trustees decided it needed to hire an "Interim President" who would occupy the position of President until a search for a new President could be completed.  In March or April of 2008, some of the members of the Board of Trustees met with a former ASU President William Harris ("Harris")[5] to discuss whether Harris would consider coming back to ASU as Interim President.  The Board of Trustees did not formally offer Harris a contract to be Interim President prior to Lee's departure.  Consequently, when Lee left the position in May of 2008, the Board of Trustees made Knight "Acting President."  Knight is a member of the Alabama State House of Representatives.  He had previously worked for ASU when Harris was President from 1994 to 2000.

_____

[4]  There is some evidence before the Court that Lee actually announced an intention to resign and not to retire.  This factual discrepancy is not material to the matters before this Court.  What is relevant is that when Lee left the position, his departure created a vacancy in the position of President.

[5]  Harris served as ASU's President from 1994 to 2000.  Harris is an African-American, male.

In late June or early July of 2008, the Board of Trustees appointed Harris "Interim President."  Pursuant to his contract with ASU, Harris would serve as "Interim Interim[sic] President and Chief Executive Officer of" ASU from July 20, 2008 to July 31, 2010 for a salary of $200,000 per year plus additional benefits such as the use of an ASU-owned car and a residence.  According to Harris' deposition testimony, in August of 2008, Harris appointed Knight to serve in a position of "Executive Vice President."

Between April of 2008 and November of 2008, the Search Committee held six meetings and discussed possible candidates for the position.  The candidates[6] that the Search Committee discussed were all African-American.  All but one of the candidates discussed were male.  The Search Committee did not place any advertisements soliciting applications for the position, nor did they interview any of candidates for the position.

The Search Committee did make contact with a "head hunter company" named Heidrick and Struggles to assist in identifying candidates for the position.  Members of the Search Committee consulted with Heidrick and Struggles on several occasions.  At the request of Heidrick and Struggles, the Search Committee began developing a "Profile" for the position of President.  The Profile the Search Committee developed contained a description of ASU, a description of the position of President, including a list of qualifications and responsibilities, a description of the type of person ASU wished to hire,

---

[6] It does not appear from the record that ASU had received any applications from any of these candidates.  Rather, the record suggests that these were just people that the Search Committee discussed because they were known to the Search Committee.

7

and a description of how to apply for the position by contacting Heidrick and Struggles.  In November of 2008, Heidrick and Struggles sent a formal offer letter setting forth the terms under which they would be retained to perform the search for the President of ASU.  No one from the ASU Board of Trustees or the Search Committee executed the proposed agreement on behalf of ASU.  Consequently, ASU did not hire Heidrick and Struggles, which was expected to demand a search fee of $100,000 to $125,000 for assisting with the search.

In December of 2008, Wiggins decided that it would be wise to suspend the search for a new President.  At the time that Dean and Wiggins suspended the search, the Profile document was a still merely a draft on which the Search Committee was working.  The Search Committee never approved or finalized that document.  The Search Committee never considered whether any candidate, including Harris, met the qualifications for the position set forth in the draft Profile document.  The Search Committee never made a recommendation to the Board of Trustees as to the employment of any person, including Harris, for the position of President.  He discussed this matter with Dean, the Chairman of the Board of Trustees.  The decision to suspend the search was not made in a formal presentation to the entire Board of Trustees, but Dean and Wiggins told the Board of Trustees that the search was suspended.[7]

---

[7] In an Affidavit submitted in conjunction with the Defendants' Motion for Summary Judgment, Wiggins states that the Board of Trustees determined that the costs of the executive search were exorbitant and ill-timed; and therefore the search was suspended. *See* Doc. 34 - Ex. 4 at ¶ 12.  However, Wiggins' Deposition Testimony from four months earlier appears to set forth a different account.   Specifically, Wiggins testified that in December of

While Harris was Interim President, he recommended the creation of a position of Executive Vice President, which the Board of Trustees approved.  Additionally, Harris recommended the creation of a position of Provost, which the Board of Trustees approved. In mid-December of 2008, ASU solicited applications for two positions: Executive Vice President and Chief Operating Officer and Provost/Vice President for Academic Affairs. According to the announcements for the positions, ASU accepted applications for the position of Executive Vice President and Chief Operating Officer from December 16, 2008 through January 9, 2009, and it accepted applications for the position of Provost/Vice President for Academic Affairs from December 18, 2008 through January 9, 2009.[8]  Harris

2008, he formed the opinion that completing the search at that time was not in ASU's best interest and he then discussed this opinion with Dean.  Wiggins further testified that he did not make a presentation to the full Board of Trustees regarding suspending the search, but that he and Dean told the other members of the Board of Trustees in general terms why they had decided to suspend the search.

    [8]  It is not clear from the record before this Court whether these vacancies were announced or posted.  To be sure there is a written job description for each with a stated period during which applications would be accepted.  Carmen Douglas ("Douglas"), the current Vice President of the Office of Human Resources at ASU, testified in her deposition that the positions were posted on various web sites and at ASU and disseminated, but it is undisputed that she did not work at ASU when that would have been happening so she cannot have personal knowledge as to those facts.  Douglas did not begin her employment with ASU until May of 2009, several months after these positions were allegedly announced. Douglas' testimony does not disclose how she formed her belief that the positions were posted and it could be that she is assuming that they were.  On the other hand, Gear contends that they were not advertised or posted, but she has no evidence of that fact.  There are no admissions before the Court to that effect.  Gear points to testimony from Wiggins which establishes that Harris conceived of the positions and recommended the persons the Board of Trustees ultimately appointed to the positions, but when specifically asked whether the positions were advertised publicly Wiggins could not remember.  Harris testified that ASU has a policy of advertising vacancies, but he gave no specific testimony as to whether these

recommended that Knight be hired as Executive Vice President and Chief Operating Officer and that Karen Scissum-Gunn be hired as Provost/Vice President for Academic Affairs. The Board of Trustees appointed them as Harris recommended.

Rather than seeking candidates for the President at that time, the Board of Trustees decided to enter into negotiations with Harris to extend the duration of his contractual term as Interim President. It made this decision for several reasons: (1) the NCAA[9] was investigating ASU and some of the allegations faulted ASU for a lack of stable leadership or university control; (2) the Southern Association of Colleges and Universities was about consider ASU's accreditation; (3) ASU expected to face reduced funding due to statewide budget cuts; and (4) the Board of Trustees was concerned about the expenses associated with hiring Heidrick and Struggles and buying Harris out of any remaining time on his contract if ASU's search for another President was successful.

On June 23, 2009, Harris received a letter from Gear and a copy of her resume. In the letter, Gear indicated her interest in the President's position at ASU, a position which she believed the Board of Trustees was seeking to fill. Harris forwarded the letter to the Vice President of the Office of Human Resources for ASU, who filed the letter and resume. At the same time she mailed this letter of interest and resume to Harris, Gear provided copies

_____

two positions were advertised.

[9] The National Collegiate Athletic Association is referred to herein as the "NCAA." On December 10, 2008, the NCAA released an infraction report finding that ASU had violated the NCAA legislation and setting out several penalties.

of the letter and her resume to the members of the Board of Trustees.  Gear received no response to her letters.

ASU began negotiations with Harris about extending his contract.  Harris was willing to continue to serve for the desired additional time period under the same contract terms except that he insisted that he not have the title of "Interim President" in the new contract. On July 25, 2009, the Board of Trustees held a meeting.   Crutcher made a motion to name Harris as "permanent" President of ASU and to revise his contract to extend its duration two additional years.  Crawley seconded the motion.  The minutes of the meeting indicate that it passed unanimously.  On October 2, 2009, ASU and Harris entered into an employment contract formalizing their agreement that he served as President and Chief Executive Officer of ASU from July 25, 2009 to July 31, 2012.  The contract provides that it may be extended.

Gear filed a Charge of Discrimination with the Equal Employment Opportunity Commission alleging discrimination against her on the basis of her race and sex.[10]  On October 19, 2009, Gear[11] filed a lawsuit against ASU and the members of its Board of Trustees in their official capacities.  Pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 2000e, she sought declaratory and injunctive relief to correct unlawful employment practices she alleged were taken on the basis of race and sex.  Specifically, she seeks an order returning

---

[10]  Gear is a Caucasian female.

[11]  Gear earned a Ph.D. in Educational Psychology in 1975.  In 1988, she obtained a J.D. and thereafter began working as an attorney.

Harris to the position of "Interim President" and compelling Defendants to conduct a new search for a President for ASU.  On October 27, 2009, Gear amended her complaint to add claims that during the two year period prior to the filing of her lawsuit, there were various vacancies in non-academic, administrative positions at ASU for which she was qualified, but that due to Defendants failure to follow its policies and the requirements of the *Craig* injunction, Gear was unable to apply for these positions.

## DISCUSSION

### A.  Overview of Applicable Legal Standard

Under Title VII, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's" race or sex.  42 U.S.C. § 2000e-2(a)(1).  The elements of a suit pursuant to § 1983 for race or sex discrimination are the same as the elements of a Title VII disparate treatment action. *See, e.g., Brown v. Alabama Dep't of Transp.*, 597 F.3d 1160, 1174 n.6 (11th Cir. 2010) (analysis of disparate treatment claims under § 1983 is identical to the analysis under Title VII where the facts on which the claims rely are the same); *Rice-Lamar v. City of Fort Lauderdale, Fla.*, 232 F.3d 836, 843 n.11 (11th Cir. 2000); *Cross v. Alabama*, 49 F.3d 1490, 1507-08 (11th Cir. 1995) "[T]he plaintiff in an employment discrimination lawsuit always has the burden of demonstrating that, more probably than not, the employer took an adverse employment action against him on the basis of a protected personal characteristic." *Wright*

*v. Southland Corp.,* 187 F.3d 1287, 1292 (11th Cir. 1999).

An employee bringing a claim under Title VII must initially establish a *prima facie* case of discrimination through one of three methods: by presenting direct evidence of discriminatory intent, presenting circumstantial evidence of discrimination by satisfying the analysis set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973) and its progeny, or by introducing statistical evidence of discrimination. *Walker v. NationsBank of Florida, N.A.,* 53 F.3d 1548, 1556 (11th Cir. 1995). Gear offers no direct evidence, nor does she rely on statistical evidence. Her case is best categorized as one based on circumstantial evidence.

To establish a discrimination claim by circumstantial evidence using the *McDonnell Douglas* framework, the employee has the initial burden of showing, by a preponderance of the evidence, a *prima facie* case of the proscribed practice. *Young v. General Foods Corp.,* 840 F.2d 825, 828 (11th Cir. 1988), *cert. denied,* 488 U.S. 1004 (1989). The essence of the *prima facie* case is that the employee presents circumstantial evidence sufficient to generate a reasonable inference by the fact finder that the employer used prohibited criteria in making an adverse decision about the employee. If established, the *prima facie* case raises a rebuttable presumption that the employer is liable to the employee. *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248 (1981). "Demonstrating a *prima facie* case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination." *Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir. 1997).

13

In general a *prima facie* case of race or sex discrimination in the context of a decision concerning hiring requires an employee to produce evidence that: (1) she belongs to the protected group; (2) she applied and was qualified for a job for which the employer was seeking applicants; (3) she was rejected; and (4) after her rejection, the position remained open and the employer continued to seek applicants from persons of the plaintiff's qualifications or the position was filled by a person outside the protected class who was only equally or less qualified.  *See, e.g., Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. at 253 n.6; *Arrington v. Cobb County,* 139 F.3d 865, 873 (11th Cir. 1998)**;** *Jones v. Gerwens*, 874 F.2d 1534, 1539 (11th Cir. 1989); *Hill v. Seaboard Coast Line R. Co.,* 885 F.2d 804, 808 (11th Cir. 1989).

The United States Supreme Court and the Eleventh Circuit Court of Appeals have repeatedly emphasized that the requisite showings that make up a *prima facie* case are not meant to be rigid or inflexible.  *See, e.g., Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. at 253 n.6;  *Schoenfeld v. Babbitt,* 168 F.3d 1257, 1268 (11th Cir. 1999) (collecting cases); *Hill,* 885 F.2d at 808 n.5; *Jones v. Gerwens*, 874 F.2d at 1539.

> In cases where the evidence does not fit neatly into the classic prima facie case formula, for example, [the Eleventh Circuit has] stated that "[a] prima facie case of disparate treatment can be established by any 'proof of actions taken by the employer from which we infer discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible considerations.'"

*Schoenfeld*, 168 F.3d at 1268 (citing *Hill v. Metro. Atlanta Rapid Trans. Auth.,* 841 F.2d

1533 (11th Cir. 1988), *modified,* 848 F.2d 1522 (11th Cir. 1988) (quoting *Furnco Constr.*

*Corp. v. Waters*, 438 U.S. 567, 576 (1978))).   The "factual inquiry" in a Title VII case is

"whether the defendant intentionally discriminated against the plaintiff." *Burdine*, 450 U.S.

at 253.   In other words, is "the employer ... treating 'some people less favorably than others

because of their race, color, religion, sex, or national origin.'" *Furnco Constr. Corp. v.*

*Waters*, 438 U.S. 567, 577 (1978), quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S.

324, 335 n.15 (1977).   The prima facie case method established in McDonnell Douglas was

"never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly

way to evaluate the evidence in light of common experience as it bears on the critical

question of discrimination." *Furnco*, 438 U.S. at 577.

Once  a plaintiff establishes the requisite elements of the *prima facie* case, the

defendant has the burden of producing a legitimate, non-discriminatory reason for the

challenged employment action.  *See, e.g., Holifield v. Reno,* 115 F.3d 1555, 1564 (11th Cir.

1997) (citing *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248 (1981)).   The employer's

burden is "exceedingly light." *Holifield,* 115 F.3d at 1564.   This burden is one of production,

not persuasion and consequently, the employer need only produce evidence that could allow

a rational fact-finder to conclude that the challenged employment action was not made for

a discriminatory reason.  *See, e.g., Crayton v. Ala. Dep't of Agriculture & Indus.*, 589 F.

Supp. 2d 1266, 1276 (M.D. Ala. 2008).

If such a reason is produced, a plaintiff then has the ultimate burden of proving the reason to be a pretext for unlawful discrimination. *See, e.g., Holifield,* 115 F.3d at 1565; *Combs v. Plantation Patterns,* 106 F.3d 1519, 1528 (11th Cir. 1997) (plaintiff "has the opportunity to discredit the defendant's proffered reasons for its decision"). Thus, once the employer articulates a legitimate, non-discriminatory reason, the burden returns to the employee to supply "evidence, including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable fact-finder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Davis,* 161 F. Supp. 2d at 1322 (citing *Chapman v. AI Transp.,* 229 F.3d 1012, 1024 (11th Cir. 2000) (*en banc*)). The plaintiff may seek to demonstrate that the proffered reason was not the true reason for the employment decision "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine,* 450 U.S. at 256; *Combs,* 106 F.3d at 1528. A plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 148 (2000).

**B.  Gear's Claims of Discrimination Relating to the Hiring of Harris as President**

### 1.  Gear Establishes a Prima Facie Case with Respect to President Position

Defendants contend that Gear fails to establish a prima facie case of discrimination

with respect to their failure to hire her to be President of ASU after she applied in June of

2009.[12]  Specifically, Defendants argue that Gear did not possess the minimum qualifications

for the position of President as set forth in the Profile,[13] that Harris is more qualified than

Gear, and that ASU was not seeking applicants for the position of President when Gear

applied.

     With respect to the issue of whether Gear possesses the minimum qualifications for

the position, the Court finds that when the evidence in the factual record is viewed in the

light most favorable to Gear, as it must be for purposes of this motion, a reasonable fact-

finder could find that Defendants failed to establish any minimum qualifications for the

position of President.  Indeed, it is undisputed that the Search Committee never finalized the

Profile which it was developing to use as a job description for the position.  Moreover, it is

undisputed that at no point did Defendants ascertain whether Harris, the candidate who was

selected to be President in July of 2009, met the minimum qualifications set forth in the

Profile.  Failure of an employer to actually require successful candidates for a position to

meet a qualification for the position prevents an employer from arguing that qualification was

---

     [12]   Although Gear discusses the hiring of Harris as Interim President in 2008 as
background information which is relevant to her claims, she has not made an issue in this
case of this decision to hire Harris as Interim President under a two year contract, nor does
she allege any claim relating to Knight's briefly being .

     [13]   It is clear from Defendants' arguments that they are comparing Gear's education
and experience to the job description the Search Committee was generating to use in the
search for a President.

a requisite minimum qualification for the position.  *See Carter*, 132 F.3d 635 (11th Cir. 1998).  At best, the evidence before this Court establishes that Defendants hired a President without establishing what the minimum qualifications for the position of President were.  In such circumstances, Defendants have deprived themselves of the argument that the unsuccessful candidate failed to meet the required minimum qualifications.  They are not entitled to summary judgment on the basis of this argument.

The argument regarding the relative qualifications of Gear and Harris is similarly unavailing.  The prima facie case requires only that a plaintiff show that she meets the minimum qualifications for the position, if any exist, and not that she was more qualified than the applicant selected.  To the extent that the body of case law addresses relative qualifications of applicants, it does so only in the context of evaluating the pretext prong of the burden-shifting paradigm and not the prima facie case.

Finally, the Court is not persuaded that Gear has failed to show evidence from which a reasonable fact-finder could believe that she applied for a position that ASU was seeking to fill.  Indeed, there is testimony which establishes that between May of 2008 when Lee left and July of 2009, the position of President at ASU was held by persons serving in only an acting or interim capacity.  Furthermore, it is undisputed that in July of 2009, the Board of Trustee's voted to approve the appointment of Harris as a "permanent" employee without the designation of Interim President and thereby filled the vacancy created when Lee resigned or retired.  Gear's application was sent to Harris in June of 2009, during the period of time

18

when the President position was occupied by an Interim President.

### 2. ASU's Proffered Legitimate Non-Discriminatory Reasons

As previously discussed, Defendants' burden of proffering a legitimate, non-discriminatory reason for the challenged employment action is a light burden. Defendants have satisfied this light burden by offering the long list of reasons for the decision to offer Harris a "permanent" position as President in July of 2009. They point to the desire to avoid the expense of completing a search and buying Harris out of his contact as Interim President, the concern about the need for stability because of the NCAA investigation, the coming re-accreditation of ASU, and the likelihood of statewide budget cuts.

### 3. Gear Offers Sufficient Evidence of Pretext to Require Trial

In order to defeat Defendants' summary judgment motion, Gear must point to evidence which would permit a reasonable fact-finder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision. Gear relies on the evidence on which she built her prima facie case, the history of discrimination in hiring and promotion of Caucasian employees at ASU, and evidence concerning ways in which the process by which Defendants accomplished the hiring of Harris as President in July of 2009 as evidence of pretext. The Court finds there is in fact evidence in the record that ASU had a policy of advertising vacant positions prior to making appointments to fill the vacancies. Moreover, it is clear that in this case Defendants embarked on a path to fill the vacancy in the position of President in March or April of 2008 which involved advertising the position

and seeking a very specific kind of applicant using a professional head hunting firm.  After engaging in this process for months, Dean and Wiggins abruptly abandoned these efforts after securing the services of an African-American male candidate as Interim President.  Indeed, they have admitted that the search was suspended in order to enter into negotiations to extend the period of time that candidate, Harris, would serve as Interim President.  Monthly later, when Defendants learned in the process of negotiations that Harris would not agree to continue to serve beyond his initial contract period unless he was hired as President and not Interim President.  Despite having the time to reopen the search upon learning this, Defendants acceded to Harris' demand rather than reopening the search for another candidate.  By doing so, they filled the position of President without following ASU's policies, and a reasonable fact-finder could believe that in so doing they hand-picked an African-American male candidate without any open and competitive process which might have called for the consideration of more qualified or equally qualified candidates of other races or sexes.

In some circumstances, an employer's failure to follow its own policies may be evidence of pretext.  *See, e.g., Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1299 (11th Cir. 2006)*; Ash v. Tyson Foods, Inc.*, 129 Fed. Appx. 529, 533 (11th Cir. 2005) (The Eleventh Circuit has "observed that deviation from company policy can be circumstantial evidence of discrimination, especially where the rules were bent or broken to give a non-minority applicant an advantage."), *rev'd on other grounds*, 546 U.S. 454 (2006)

(employer's failure to post a job vacancy constitutes circumstantial evidence of discrimination where employer had a policy of posting job vacancies especially where that failure gave an edge to a candidate of a different race); *Bass v. Bd. of County Comm'rs, Orange County*, 256 F.3d 1095, 1108 (11th Cir. 2001) ("An employer's violation of its own normal hiring procedure may be evidence of pretext.");  *Berg v. Fla. Dept. of Labor*, 163 F.3d 1251, 1255 (11th Cir.1998); *Carter v. Three Springs Res. Treatment*, 132 F.3d 635, 644 (11th Cir.1998) (employer's failure to follow its own policy of posting vacancies constitutes evidence of pretext especially when it give a person of a different race than plaintiff an edge in the application process); *Hill v. Seaboard Coast Line R.R.*, 885 F.2d 804, 811 (11th Cir. 1989); *Morrison v. Booth*, 763 F.2d 1366, 1374 (11th Cir.), *reh'g denied*, 763 F.2d 1366 (11th Cir. 1985) (fact that employer was willing to bend or break the rules to help an employee of a certain race constitutes evidence of pretext because departures from normal procedures may be suggestive of discrimination); *Brown v. Chert off*, 563 F. Supp. 2d 1372, 1378 (S.D. Ga. 2008); *Connor v. Sun Trust Bank*, 546 F. Supp. 2d 1360, 1374-75 (N.D. Ga. 2008) (employer's failure to follow its own internal policies evidence of pretext despite genuine issue of material fact as to whether policies were mandatory).  The Court finds that the factual record, when viewed in the light most favorable to Gear, is sufficient to create a triable question as to whether the legitimate, non-discriminatory reasons for this course of

action are pretextual.[14]

## C.  Gear Claims of Discrimination Relating to Positions Other Than President[15] Fail

Defendants argue that they are entitled to judgment as a matter of law on her claims of discrimination with respect to the position of Executive Vice-President and Provost/Vice President for Academic Affairs because Gear's failure to apply for the positions and because Gear did not possess the minimum qualifications for these positions.  Due to deficiencies in the factual record before the Court, the Court declines to address Defendants' contention that Gear failed to apply for these positions.[16]  Nevertheless, the record before the Court compels

---

[14]  Defendants argue that certain policies and procedures to which Gear points in support of her contention that Defendants violated ASU's policies and procedures, do not actually apply to the position of President at ASU.  The Court does not find this persuasive. First, there is evidence before the Court from which a fact-finder could find that ASU's policy requires, at a minimum, all vacancies to be advertised before they are filled, even a vacancy in the position of President.  It is undisputed that this vacancy was not advertised before it was filled.   Thus, there is evidence from which a reasonable fact-finder could conclude that Defendants failed to follow ASU's policy.   Second, to the extent that Defendants contend that there are no policies which require any specific course of action to fill the position of President that argument is also problematic legally.  Failure to promulgate hiring and promotion policies can be circumstantial evidence of discrimination.  *Harris v. Birmingham Bd. Of Educ.*, 712 F.2d 1377. 1382-83 (11th Cir. 1983).  Thus, the very absence of policy which Defendants argue exists is evidence from which requires a trial to resolve the issue of pretext.

[15]  The First Amended Complaint is rather vague as to which positions other than President Gear claims she was discriminatorily denied.  In her responses to written discovery, however, Gear indicated that the positions other than President about which she raised issues were the Provost/Vice President for Academic Affairs position and the Executive Vice President and Chief Operating Officer Position.

[16]  In order to rely on Gear's failure to apply, ASU would need to establish that it sought applicants for the position.  There appears to be an absence of factual support for

the conclusion that Gear cannot establish a prima facie case of race or sex discrimination with respect to the failure to hire her for the position of Provost/Vice President for Academic Affairs or the position of Executive Vice President and Chief Operating Officer.  It is undisputed that ASU established certain minimum qualifications for these two positions.  It is also undisputed that Gear does not possess the minimum qualifications for these two positions.  Gear makes no attempt to establish that the successful candidates for these positions also failed to possess the minimum qualifications she lacked for the positions so that this Court would have a basis for finding those minimum qualifications were not actual qualifications for the positions.  Indeed, the only argument Gear makes in her brief in opposition to summary judgment takes issue with whether the positions were filled without being advertised.   To establish a prima facie case, she must do more.  An employment discrimination plaintiff in a failure to hire case bears the burden of establishing that she possessed the minimum qualifications for the position the prospective employer denied her. Accordingly, Defendants' Motion for Summary Judgment is due to be GRANTED as to the claims in Count III of the First Amended Complaint.

## CONCLUSION

For the foregoing reasons, it is hereby ORDERED as follows:

---

Defendants' contention that the positions were advertised because the only testimony to that effect comes from someone who did not work at ASU during the relevant time period and has not otherwise explained the source of her "knowledge" on this subject.

1.  Defendants' Motion for Summary Judgment (Doc. # 34) is GRANTED as to all claims of discrimination arising out of hiring decisions for positions other than President and DENIED as to all claims arising out of the hiring of Harris as President in 2009.

2.  Count III of the First Amended Complaint (Doc. # 7) is DISMISSED with PREJUDICE.

DONE this the 24th day of February, 2011.

/s/ Mark E. Fuller
CHIEF UNITED STATES DISTRICT JUDGE